ASSOCIATED INDEMNITY
CORPORATION,
Plaintiff-Appellant,

v.

MILLER–CAMPBELL CO., a corporation,
d/b/a Jack Miller Chrysler/Plymouth,
Defendant-Respondent,

Truck Insurance Exchange,
Defendant-Appellant,

DRAC-Chrysler Motors Corporation,
Chrysler Leasing Corporation, and The
Continental Insurance Company of New
York, Defendants-Appellants,

Hazel G. Thurston and Raymond
Thurston, Defendants-Appellants,

Jerry Stevenson and Donna Stevenson,
Defendants-Respondents.

No. 61721.

Supreme Court of Missouri,
En Banc.

March 11, 1980.
Rehearing Denied April 8, 1980.

Sylvester Powell, Jr., Kenneth O. Smith, James Welsh, Kansas City, for defendants-appellants.

Thomas J. Conway, Clyde G. Meise, W. Edward Coen, Jr., Harl T. Hanson, Kansas City, for defendants-respondents.

SEILER, Judge.

The question presented by this declaratory judgment action is which of three liability insurance policies covers a claim for personal injuries growing out of an automobile accident. Complications arise from attempted transfers of title to the vehicle involved, a 1974 Plymouth station wagon, and from the station wagon's having been under the Chrysler Corporation dealer rent-a-car program.

The automobile accident occurred on April 5, 1974. Mrs. Thurston was driving the station wagon. She collided with Jerry Stevenson, who sustained serious injuries. Jerry Stevenson and his wife, Donna, have obtained a substantial judgment against Mrs. Thurston. Mrs. Thurston was a named insured under the standard automobile liability policy of Associated Indemnity Corporation (the station wagon replaced another vehicle insured by Associated which the Thurstons traded in as a down payment on the 1974 Plymouth station wagon). Associated, apparently while this case has been on appeal, has arrived, we are informed, at a disposition of the Stevenson claims against it and is no longer interested in the case. The Stevenson judgment exceeds the Associated coverage, however, and the question remains whether Mrs. Thurston is also an insured under and entitled to the protection of policies issued by Continental Insurance Company to Chrysler and by Truck Insurance Exchange to the Chrysler dealer, Miller-Campbell Company d/b/a Jack Miller Chrysler/Plymouth, of Liberty, Missouri.

By way of background, in 1973 and 1974 Chrysler had a dealer rent-a-car program, known as DRAC. Under a lengthy written lease agreement, Chrysler Leasing Corporation, a Delaware corporation, would lease Chrysler automobiles to Chrysler dealers for a maximum of twelve months. The vehicles were financed by Chrysler Motor Corporation and each month the dealer paid the motor corporation, as assignee of the leasing corporation, a monthly charge for each vehicle leased, made up of depreciation, insurance and finance charges. In return, the dealer could use the vehicles for the sole purpose of renting such vehicles in the dealer's vehicle rental business and, after certain periods of time, could purchase the vehicles at prices determined by the capitalized cost less, in most cases, the monthly depreciation allowance. "Vehicle rental business" was defined in the lease contract as "the business of renting any vehicle or combination of vehicles on an hourly, daily, weekly or monthly basis with no rental period to exceed six (6) months with any one rentee." Continental provided coverage for all leased automobiles under a policy which listed as the named insured Chrysler Corporation, Chrysler Motors Corporation, DRAC–Chrysler Leasing Corporation and the participating dealer, (here Miller).

Miller as an automobile dealer was also insured under a separate policy by Truck Insurance Exchange for bodily injury and property damage caused by an occurrence with respect to the use of an automobile under certain terms and conditions mentioned later herein.

During 1973 and 1974 Miller was one of Chrysler's participating dealers in the DRAC program. One of the leased cars

was the Plymouth station wagon. On a Saturday afternoon, March 30, 1974, Mr. and Mrs. Thurston came to Miller's place of business looking for a car. They decided to buy the 1974 Plymouth station wagon at a price of $4,318.00, $1,000.00 of which was to be the trade-in of Thurston's 1969 Chevrolet pickup. The balance was to be financed by Thurston's credit union, something which would require an additional two weeks' time to arrange. Thurston made a cash deposit of $20.00 and signed a note to Miller for the balance, payable April 13, 1974, at which time he expected to return to Miller to pay the note with the money obtained from the credit union, which would take a lien on the station wagon to secure its loan to Thurston. The station wagon had 8,250 miles on it. The Thurstons thought it was a demonstrator. In fact, it was a leased vehicle which had been used in the dealer's rent-a-car business for about five months, being rented out on nine occasions, for periods running from one to nineteen days.

Thurston turned over his pickup truck to Miller's salesman, took possession of the station wagon and departed, with the station wagon either bearing dealer's license tags or the tags it had as a leased vehicle. Mrs. Thurston called the Associated agent, told him they had bought the station wagon and wanted coverage, which the agent assured them they had. As earlier said, Associated has settled with the Stevensons for whatever its liability is for Stevenson's injuries.

.To go back to the history of the station wagon prior to March 30: When the vehicle was manufactured, Chrysler Motors Corporation, using a form of document known as manufacturer's statement of origin to a motor vehicle (commonly referred to as an MSO) transferred the vehicle to Chrysler Leasing Corporation, to be tagged for the DRAC program. The MSO was executed on October 8, 1973 and served to put legal title to the vehicle in Chrysler Leasing Corporation.[1] As will be seen presently, this is where title has remained.

The vehicle was delivered to the Miller dealership in Liberty. The DRAC lease agreement provided that any certificate of registration was to indicate clearly that the lessor, or other person designated by the lessor, was the legal owner. Nothing in the record shows any authorizations to Miller to put title back in Chrysler Motors Corporation, but Miller, on October 23, 1973, in the name of DRAC–Chrysler Motors Corp. purported to make application for a Missouri certificate of title to be issued on the station wagon, putting up $30.00 for a license and $127.73 in sales tax. On January 1, 1974, a Missouri certificate of title was issued on the station wagon to DRAC–Chrysler Motors Corp., showing a first lien in Chrysler Motors Corp. No application for transfer of title was made by the holder of legal title, Chrysler Leasing Corporation, and no certificate of title issued to Chrysler Leasing.

On April 1, 1974, Miller, again in the name of DRAC–Chrysler Motors Corp., purported to make an assignment of title on the reverse side of the above certificate to Jack Miller Chrysler-Plymouth and then, also on April 1, 1974, under the portion headed "Re-Assignment by Registered Dealer Only", purported to assign the title to Ray K. &/or Hazel G. Thurston. Thereafter, on April 13, 1974 (although the date continued to be shown on the certificate as 4/1/74) Miller inserted as lienholder Guy's Nut & Chip Credit Union, Liberty, the credit union where Thurston borrowed the money to pay the note he had given Miller.

Thurston, either on March 30, 1974 (according to Miller's salesman) or on April 13, 1974 (according to Mr. and Mrs. Thurston) signed an application for title in his name.

On April 1, 1974, Miller signed a card denominated Dealer Rent-A-Car Early Retirement Notice requesting termination of the station wagon from the DRAC program on that date. This card was stamped received by Chrysler in Detroit May 1, 1974.

---

1. See § 301.200, RSMo 1978. This was a new, not a used or previously registered vehicle, so that § 301.210 RSMo 1978 did not apply. See

*Galemore v. Mid-West National Fire & Casualty Insurance Co.*, 443 S.W.2d 194 (Mo.App. 1969).

Miller sent his check to Chrysler Motors Corporation on April 23, 1974, amount $3,377.33, in payment of the station wagon. The check was deposited by Chrysler on May 1, 1974. The regular monthly statement and detailed invoice from Chrysler charged Miller with the usual depreciation, insurance and finance charges on the station wagon for the entire month of April and for one day in May, with the off lease date stated on the invoice as May 1, 1974.

The Stevensons brought suit against Mrs. Thurston for damages. Associated defended the action. Continental and Truck Insurance refused to participate. Associated then brought a declaratory judgment against all the parties and persons mentioned above.

The declaratory judgment was filed November 22, 1974. In their pleadings the insurance companies, at least at the outset, regarded the matter of where title lay to the 1974 Plymouth station wagon on April 5, 1974, as decisive of the coverage question.

Associated (the Thurstons' insurer) alleged title was vested in DRAC–Chrysler Motors or Chrysler Leasing Corporation and that any coverage under the Associated policy was excess coverage only.

Truck Insurance Exchange (the dealer's insurer) took the position the vehicle was owned by the Thurstons.

Continental Insurance Company, DRAC–Chrysler Motors and Chrysler Leasing Corporation took the position title was either in the Thurstons or the dealer.

Subsequently, Continental, Chrysler Motors and Chrysler Leasing amended their answers to add that under the Continental policy the insurance to the dealer ceased when the dealer elected to purchase the car, which they contended occurred on April 1, 1974, four days prior to the accident; that the insurance was limited to rented vehicles and the vehicle in question was the subject of a sale and not a rented automobile.

Thereafter, Truck Insurance amended its answer to set up a res judicata defense, saying that by virtue of a prior suit between the Thurstons and Miller (dealer), title had been determined to be in the Thurstons. Shortly thereafter, Continental, DRAC–Chrysler Motors and Chrysler Leasing amended their answers to add the res judicata defense.

Additionally, in the declaratory judgment action, the Thurstons sought a declaration that Associated had collision coverage on the 1974 Plymouth station wagon and also owed them penalties and attorney fees for vexatious refusal to pay and if this claim were determined adversely, the Thurstons sought a declaration that Truck Insurance covered the collision damage on the ground that Mrs. Thurston was driving the vehicle with the permission of Miller, the dealer.

Stevensons admitted the allegations of plaintiff's petition and also sought the same declaration—namely, that the Associated policy provided excess coverage to that of the other insurers.

The trial court found that the station wagon was not retired from the rental fleet by Miller until after April 13, 1974, that title to the vehicle at the time of the motor vehicle accident was in Chrysler Leasing Corporation, that the primary insurance coverage was with Continental, that the Associated and Truck Insurance policies were excess coverage and any exposure over the Continental coverage was to be prorated between them. There are other pertinent facts in the case in addition to those set forth above, which we will mention as we proceed.

The appeals went first to the Court of Appeals, Western District, which held that Associated was precluded by collateral estoppel by reason of the suit between the Thurstons and Miller-Campbell from relitigating title to the station wagon as of the time of the accident and remanded the cause with directions to enter judgment finding there was no coverage under either the Continental or Truck Insurance policies. On application of the Stevensons, we ordered the cause transferred here, where we will treat it as though here on original appeal. Mo.Const. art. V, § 10.

The parties have not cited any cases which fit or are close to the above facts, nor have we been able to find any.

## I

*Coverage Under the Continental Policy*

 Continental presents several grounds as to why Mrs. Thurston was not covered under its policy. One which we believe is to be ruled in its favor is the contention that the station wagon, at the date of the accident, was not a rented automobile and hence no coverage exists as to Mrs. Thurston. The portion of the policy relied on is headed:

"AUTOMOBILE RENTAL OPERATIONS NAMED INSURED AND RENTEE"

The pertinent provisions are as follows:
"It is agreed that such insurance as is afforded by the policy applies with respect to rented automobiles subject to the following provisions:

"I. Insuring Agreement III 'Definition of Insured' is deleted and replaced by the following:

(a) With respect to coverages afforded by the policy the unqualified word 'insured' includes the named insured, a rentee and also includes any person while using a rented automobile and any person or organization legally responsible for the use thereof, provided the actual use of a rented automobile is by the named insured or by the rentee or with the permission of either . ."

Continental maintains that Mrs. Thurston was not a named insured, nor a rentee, nor using a rented automobile, nor was there an actual use of a rental automobile by a named insured or a rentee, or with the permission of either. The Continental policy does not define rentee or rented automobile.

Certainly Mrs. Thurston was not a named insured under the Continental policy. Nor was she a rentee.[2] She did not obtain the possession or the use of the station wagon for rent or by paying a rental, nor had anyone with the authority to do so allowed her the possession and use of the station wagon for rent. The undisputed fact is that Mr. and Mrs. Thurston thought they had purchased the car, as did Miller, the dealer. In fact, however, no transfer of title to the Thurstons occurred, nor could it, as title was still in Chrysler Leasing Corporation as pointed out earlier. Regardless of their lack of title, the Thurstons were not trespassers, tamperers or thieves as to the car—they had Miller's permission to use it as their own even though based on an erroneous assumption that Miller was in a position to make a legal sale to them of the car. Mrs. Thurston, therefore, when she was driving the automobile on April 5, 1974, had its use with the permission of Miller, a named insured.

But, as stated above, she was not a rentee, nor do we believe it can be said that she was using a rented automobile. She was using an automobile which the Chrysler Leasing Corporation had leased to Miller, the dealer, but it does not follow that the vehicle while she was using it was therefore a rented automobile within the meaning of the policy.

The DRAC lease agreement between Chrysler Leasing Corporation and the dealer sharply differentiates between leasing and renting. The vehicles which are the subject of the agreement are many times referred to as being leased to the dealer, who is consistently referred to as the lessee. The lease limits the use which the lessee can make of the leased vehicles to the "renting [of] such vehicles in its vehicle rental business." "Vehicle renting business" is defined as the "business of renting any vehicle . . . on an hourly, daily, weekly or monthly basis with no rental

---

**2.** We have not been able to find the word "rentee" in a dictionary. The word consists of "rent" with the suffix "ee". That suffix is used to designate a person who is furnished with or the recipient of something—usually the indirect object of the verb from which it is derived. Here the rentee is the person to whom the vehicle is rented by the dealer.

period to exceed six (6) months for any one rentee." The lease requires payments by the lessee of a monthly lease charge, regardless of whether the lessee succeeds in renting the vehicle. The agreement restricts the lessee against renting the vehicles for certain purposes (such as taxicabs, police cars or demonstrators) or to drivers having physical handicaps, or under 22 years of age, or with moving violation records on their licenses.

While the lease contract is not incorporated as part of the Continental policy, the policy is stated to provide coverage for all automobiles leased by the dealer under the DRAC program and evidently was written with the DRAC program in mind. Associated and the Stevensons argue, however, that a "rented automobile" as used in the clause quoted earlier as to who is an insured means any vehicle which is in the possession of the dealer under the DRAC program and is not limited to vehicles rented by the dealer to a third party. They point out that the policy expressly states that the insurance afforded the dealer attaches at the time the dealer signs the transporter bill of lading accepting the automobile, which would be prior to any renting of the vehicle to a third party. This they say supports their argument that the car does not have to be a "rented" automobile to be covered.

We believe the language quoted simply states the moment at which the insurance coverage commences according to its terms and we do not believe the policy provides the broad coverage suggested by plaintiff, which would mean that anyone who had the permission of the dealer to use one of the leased automobiles would be covered. The policy does not speak in terms of providing coverage for third parties on vehicles leased to the dealer. It refers to "Automobile Rental Operations" and the use of a "rented automobile." In the "Exclusions" portion of the policy it refers to the policy not applying "if at the time the rental agreement is signed", the dealer is aware the vehicle will be used as a livery conveyance, or while the rented automobile is being operated by a person not authorized to operate "under the rental agreement" or while the rented automobile is used in violation of the "rental agreement." The rental agreement mentioned is not the agreement between Chrysler Leasing Corporation and the dealer; it is the agreement between the dealer and his customer. The "rented automobile" referred to is the vehicle which is the subject of that rental agreement, not a vehicle leased by Chrysler to the dealer and not rented by the dealer to a customer.

If the policy were meant to extend coverage to any permissive user of a vehicle leased to the dealer there would have been no purpose in inserting into the coverage language the concept of an automobile rented to a third party called a rentee and exclusions hinged on the rental agreement between the dealer and the rentee. None of this would have been needed had coverage been intended for any person using, with the dealer's permission, one of the automobiles leased to the dealer. If the position of Associated and the Stevensons were adopted, the words "rented" and "rentee" would be superfluous. We believe the coverage provided by the Continental policy was intended to and does provide for coverage on the vehicles which the dealer rents to customers under his vehicle renting business. It is not intended to and does not provide general liability coverage for anyone who happens to be using one of the leased vehicles, without renting it, merely as a permissive user of the dealer.

Associated and the Stevensons also contend that Continental has waived its right to the "rented automobile" defense above discussed, by originally having relied on another defense. The trial court found there had been such a waiver and that the "rented automobile" defense was not available.

The facts on this aspect of matter are these: On July 24, 1974, counsel for Associated made written demand on Continental and Truck Insurance to defend the damage suit which the Stevensons had filed against Mrs. Thurston, on the ground that their coverage was primary and Associated's only secondary. On August 1, 1974, Continental replied, declining to do so on the ground

that the Continental policy provided that its coverage would cease on the date the dealer elected to purchase the vehicle in question, which according to Continental occurred on April 1, 1974, prior to the accident. No mention was made by Continental of the "rented automobile" aspect of the case. It was first raised in an amended answer filed by Continental September 25, 1975.

Associated and Stevenson rely on the proposition that having denied coverage on a specific ground, the insurer may not thereafter deny coverage on a different ground, citing various cases so declaring.[3] Continental responds that neither waiver nor estoppel can be used to expand coverage or to establish coverage when it does not otherwise exist.

If Continental is barred by waiver from asserting that coverage under the circumstances before us does not extend to Mrs. Thurston, even though she was not driving a rented automobile and was not a rentee, the effect of such holding would be to extend coverage to non-rented automobiles, in effect rewriting the policy. The rule, however, as stated in *Linenschmidt v. Continental Casualty Co.*, 356 Mo. 914, 204 S.W.2d 295, 302 (1947) is that "Waiver and estoppel operate, when applicable, to preserve rights already acquired, the prevention of forfeitures or avoidance of duties, and not to create new rights, new causes of action . . . Hofmann, the judgment debtor here, was not personally entitled to the protection of the instant insurance contract and plaintiff may not thus create a new contract of liability against the insurer . . ."

So it is with Mrs. Thurston. She was not personally entitled to the protection of the Continental policy merely as the permissive user with the dealer's consent. See also

Couch, Cyclopedia of Insurance Law (2d Ed. 1968) Vol. 18, § 71:39, pp. 32–33; Appleman, Ins. Law and Proc. (1968) Vol. 16A, § 9090, pp. 341, 344.

Finally, on this point, Associated and the Stevensons argue that Continental is estopped from raising the "rented automobile" defense by failing to return the premiums which were paid by the dealer on the vehicle in question through May 1, 1974, the date on which Chrysler released the car from the DRAC program.[4]

■ The cases cited do not help the plaintiffs. They deal with situations where for one reason or another the insurer was taking the position that the policy was void. The cases hold that the insurer cannot take the position the policy is null and void and at the same time retain the premiums. That is not the situation here. Continental is not contending the policy is void or not in effect. It is contending that there was no coverage extended to Mrs. Thurston under the circumstances. The charging of a monthly premium to the dealer on the Plymouth until the date the vehicle was released from the DRAC program is not inconsistent with the denial of coverage to Mrs. Thurston.

## II

### Coverage Under the Truck Insurance Exchange Policy

Truck Insurance contends its policy affords no coverage to Mrs. Thurston because "for all practical purposes transfer of title to the Plymouth station wagon from Jack Miller to the Thurstons occurred on Monday, April 1, 1974", that there was a constructive delivery of the title to the Thurstons, that the vehicle was not owned by Miller, but was in fact, owned by the Thur-

3. Cited are *Aetna Casualty & Surety Co. v. Haas*, 422 S.W.2d 316 (Mo.1968); *Hounihan v. Farm Bureau Mutual Insurance Co.*, 523 S.W.2d 173 (Mo.App.1975); *Stone v. Waters*, 483 S.W.2d 639 (Mo.App.1972); and *Kammeyer v. Concordia Telephone Company*, 446 S.W.2d 486 (Mo.App.1969).

4. Cited are *Goffe v. National Surety Company*, 321 Mo. 140, 9 S.W.2d 929, 933 (1929); *Lux v. Milwaukee Mechanics' Insurance Company*, 30 S.W.2d 1090, 1093 (Mo.App.1930); *Carroll v. Union Marine Insurance Company, Ltd. of Liverpool*, 249 S.W. 691, 692 (Mo.App.1923); and *Dyer v. American Insurance Company of Newark, N.J.*, 211 Mo.App. 476, 244 S.W. 964, 965 (1922).

stons and their insurer, Associated Indemnity afforded the insurance coverage for the accident of April 5, 1974; further, that even if title were still in the name of Jack Miller, the Thurstons were in any event covered by Associated under the circumstances and hence under the provisions of the Truck Insurance policy there was no coverage afforded. The policy language relied on by Truck Insurance is found in the part defining "Persons Insured" and states:

> "(ii) any other person while operating with the permission of the named insured *any such equipment* registered in the name of the named insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization." (emphasis supplied).

There are two difficulties with the above contentions: First, title was not transferred to the Thurstons by Miller. Miller had no title to transfer, as has earlier been pointed out. There was here no "constructive delivery" under the cases [5] cited by Truck Insurance as justifying a relaxing of the strict requirements of our motor vehicle registration and assignment of title statutes, § 301.210 and 301.620, RSMo. 1978.

The facts in those cases are not sufficiently similar to the present case to help Truck Insurance. If we were to hold there was a constructive transfer of title here from Miller to Thurston, sufficient to meet the statutory requirements, we would be sanctioning the efficacy of any title assignment which looks valid on its face, regardless of whether the transferor actually held title, a practice which would encourage fraud and deceit and defeat the purpose of the statutes.

Second, the clause of the policy on which Truck Insurance relies, quoted above, is not applicable to the facts before us. The clause relieves the insurer when there is other insurance available to the other person (here Mrs. Thurston) when the other person is "operating with the permission of the named insured *any such equipment* . . . ." (emphasis supplied). To apply the clause, it must be determined to what the words "any such equipment" refer. These words refer to subparagraph (5) under (A) of Section III. Subparagraph (5) deals with "mobile equipment registered under any motor vehicle registration law". "Mobile equipment" is specifically stated in paragraph (A) of Section V, "Definitions" as not being included in the word "automobile" with respect to liability coverage. Then in paragraph (I) of "Definitions", "mobile equipment" is defined as being equipment such as power cranes, shovels, loaders, graders, road construction or repair equipment, etc. It is apparent, therefore, that the Plymouth station wagon is not within the meaning of "any such equipment" as used in the clause on which the insurer seeks to rely and the clause constitutes no defense. The above two defenses are the only policy ones offered by Truck Insurance. Neither is valid.

The Truck Insurance policy is self-entitled "A Package of Protection for Automobile Dealers". It is not limited to or designed in particular for coverage of leased or rented automobiles, and it contains no reference to the DRAC contract. The policy, under the liability section, covers "bodily injury to any person . . . arising out of the use of any automobile . . . to which the insurance applies, caused by an occurrence." Within the persons insured section of the policy is "any other person while using a hired automobile with the permission of the named insured" (Miller). While we have earlier held that the Plymouth automobile was not a "rented automobile" within the meaning of the Continental policy (the Continental policy contained no definition of "rented automobile"), the Truck Insurance policy defines a "hired automobile". It is defined with respect to the liability coverage as one "used under

---

**5.** Cited are *State Farm Mutual Automobile Insurance Company v. Western Casualty & Surety Company*, 477 S.W.2d 421 (Mo. banc 1972); *Galemore v. Mid-West National Fire and Casualty Insurance Company*, 443 S.W.2d 194 (Mo. App.1969).

contract in behalf of . . . the named insured provided such automobile is not owned by or registered in the name of (a) the named insured . . ." The definition does not require that any rent or hire be paid or agreed upon or that there be any hiring agreement. The definition does not further define the words "used under contract in behalf of".

█ The Plymouth station wagon was not owned by or registered in Miller's name, despite the various purported assignments attempted by him, set forth earlier, so the question becomes, was it being "used under contract in behalf of the named insured", Miller? It can reasonably be said that at the time of the accident the station wagon was being used by Mrs. Thurston by virtue of the rights which Miller had in it as one of his leased vehicles which he could sell under the DRAC contract and hence was being used in his behalf as well as hers. The purported sale by Miller to the Thurstons all took place between two and five o'clock on a Saturday afternoon. The Thurstons thought the car had been used as a demonstrator, when actually the car had been used as a rental vehicle. Thurston paid $20.00 down, traded in his 1969 pickup truck and signed an unsecured promissory note for the balance of $3,318.00, payable in two weeks. Completion of the deal depended upon Thurston's obtaining a loan from his credit union and presumably his continuing to believe the car had been used only as a demonstrator. The entire deal was rather tenuous and could have collapsed before the two weeks expired. So Mrs. Thurston's use of the automobile on April 5, 1974, made by her in the erroneous belief that she and her husband had purchased the vehicle, was at the same time a use in behalf of Miller as a dealer who wanted to make a sale of the vehicle to her and her husband, but had not yet done so. Use of the vehicle by the Thurstons as their own was a benefit to Miller, the dealer, in maintaining their keeping and using of the automobile as though it belonged to them, which helped Miller in his effort to sell them the car. The Truck Insurance policy, therefore, provided coverage to Mrs. Thurston.

## III

### *The Collateral Estoppel Issue*

There is one other basis on which both Continental and Truck Insurance contend there is no coverage here save under the Associated Indemnity policy. The facts in this regard are as follows: In addition to liability, the Thurstons also had $50.00 deductible collision coverage under their Associated policy. After the accident the damaged Plymouth station wagon was taken to Miller-Campbell for repairs. Thurston's insurer (Associated) obtained a repair estimate. Thurston had Miller do the work, but expected his insurance company to pay for it. The repair work dragged on for several months, and, in fact, according to Thurston the car was not "released" to him for a year and a half.

On July 19, 1974, the Thurstons filed suit against Miller-Campbell Company, d/b/a Jack Miller Chrysler-Plymouth, Inc. Eventually, by a second amended petition, the suit was in three counts. Count I was that the sale of the Plymouth station wagon was fraudulent and void, being in violation of § 301.210 and plaintiffs were entitled to rescind the purported sale and recover the consideration paid by them. Count II was that defendant had fraudulently represented that it owned the vehicle and was able to convey title and that the vehicle had been used as a demonstrator, whereas in truth plaintiff was unable to obtain title and the automobile had in fact been owned by an auto leasing company and had been leased prior to the sale to plaintiffs. Count III was similar to the allegations of Count II but charged a violation of § 407.020, pertaining to unlawful merchandizing practices. Miller-Campbell filed a counterclaim for the amount of its repair bill. The Thurstons asked Associated Indemnity to undertake the defense of the counterclaim, which Associated refused to do.

The case was tried before the court on September 8 and 9, 1975. At conclusion of plaintiffs'· case, the court sustained defendant's motion for a directed verdict as to all

counts of the petition and after hearing defendant's evidence entered judgment for defendant on the counterclaim for $1,565.77 and costs. No appeal was taken from that judgment.

Continental and Truck Insurance contend that the above trial necessarily determined that title had passed to the Thurstons and that the sale was not in violation of the statute; that the issue before the court in the present declaratory judgment action is what company afforded coverage and that necessarily depended upon who had title to the station wagon on April 5, the date of the accident; that Associated Indemnity under its policy was the "contractual indemnitor of the Thurstons" and was therefore in privity with the Thurstons and hence bound on the issue of the ownership of the vehicle.

The court of appeals was of the opinion that Associated Indemnity was barred by collateral estoppel from litigating in the present action the title to the station wagon at the time of the accident, pointing out that Associated was requested to defend the counterclaim "under the collision coverage in Associated's policy", declined to do so and being in privity with Thurstons by virtue of being their insurer (citing *Guarantee Insurance Co. v. Great American Indemnity Co.*, 163 F.Supp. 320, 323, E.D.Mich.1958), is estopped to deny that title was in the Thurstons and that therefore no coverage was afforded by either the Continental or Truck policies.

■ This view misconceives what the liability coverage and the collision coverage of the Associated policy required it to do. Under the collision coverage Associated agreed to pay for loss caused by collision to the owned automobile or to a non-owned automobile to the amount in excess of the deductible. It did not agree under the collision coverage to defend or indemnify the Thurstons for claims or counterclaims brought by the person making the repairs for failure to pay the bill. Under the bodily injury and property damage portion of the policy Associated agreed to pay on behalf of the insured all sums which the insured be-

came legally obligated to pay by reason thereof and also agreed to "defend any suit alleging such bodily injury or property damage", but no such claim was asserted by the Miller-Campbell counterclaim. Part I of the policy, the portion setting forth the liability coverage and the obligation of the insured to defend, provides under (i) of Exclusions that no coverage under Part I is provided for "injury to . . . any automobile in charge of the insured". This exclusion would apply here, as Mrs. Thurston was in charge of the Plymouth station wagon. The Miller counterclaim was not a claim for property damage done by the insured to someone else's property, but was a claim for the cost of making repairs to the damaged property of the insured, a breach of the implied or express agreement to pay for the repairs. The policy contained no provisions obligating Associated to provide a defense for such a claim or to enter the Thurston v. Miller suit, and therefore the requirement that Associated be in privity with the parties to the prior adjudication is missing and the defense of collateral estoppel is not available to Continental and Truck Insurance to contend that the title has been adjudicated in the Thurstons and that Associated cannot contend otherwise, thereby relieving Continental and Truck Insurance altogether. Their contention to that effect is overruled.

## IV

### *Thurston Claim for Collision Damage Coverage*

■ There remains the matter of the collision coverage on the Plymouth station wagon, the cost of repair being $1,515.77. The trial court held that Associated Indemnity was estopped to deny that there was collision coverage (with $50.00 deductible) under its policy and that Truck Insurance Exchange had waived its right to rely on any exclusionary clause in its policy by failing to assert such defense in its answer to the crossclaim made by the Thurstons. The trial court prorated the loss between the two companies-$770.00 as Associated's share and $745.76 as Truck's share. The Associat-

ed collision coverage covered either an owned or non-owned automobile. The Truck Insurance Exchange's collision coverage (with $100.00 deductible) covered automobiles held by the insured for sale, but under "Exclusions", paragraph 1(c)(2), it was provided that collision coverage did not apply with respect to a non-owned automobile "to any loss sustained while the automobile is not in the lawful custody of the named insured".

The Plymouth station wagon was a non-owned automobile and it was not in the custody of the named insured, Miller, at the time of the loss and in light of the above exclusion the trial court erred in holding Truck Insurance liable for any portion of the collision claim. The entire collision claim, therefore, was the responsibility of Associated.

### V

Our holding is that Associated and Truck Insurance had liability coverage in this case. As we understand it, although the record is not complete in this respect, the Associated policy had limits of $10,000 with respect to "each person" and $20,000 with respect to "each accident."

The Truck Insurance policy provides that with respect to a non-owned automobile, the insurance as to liability shall be excess insurance over any other valid and collectible insurance. Apparently the Truck Insurance policy provides $100,000 coverage for each person and $200,000 coverage for each occurrence.

We do not have complete information as to the amount of the Stevenson judgment, but the same is available to or can be obtained by the trial court on remand as needed. The judgment is reversed as to Continental Insurance Company of New York, DRAC–Chrysler Motors Corporation and Chrysler Leasing Corporation. Judgment is affirmed as to defendant Truck Insurance Exchange, except as to the portion of the judgment assessing $745.76 collision damage against said defendant, which portion is reversed, and the cause is remanded with instructions to the trial court to enter judgment against Associated Indemnity Company for $745.76 on the collision claim of the Thurstons and to enter judgment against Truck Insurance Company for whatever part of the Stevenson judgment against Mrs. Thurston for which such insurance company is liable under its policy consistent with the foregoing opinion.

All concur.

### ON MOTION FOR REHEARING
### PER CURIAM:

In its motion for rehearing, defendant Truck Insurance points out that its policy provides that "the insurance does not apply to bodily injury or property damage arising out of the use of a non-owned or hired automobile unless it is with the permission, or reasonably believed to be with the permission, of the owner" and that in this instance Chrysler Leasing Corporation (the owner) never gave its consent that the station wagon could be sold or demonstrated before it was removed from the rental program. While this exclusionary clause was not raised by Truck Insurance in its pleadings nor briefed or argued to the court as part of this appeal, we will respond to it as it does bear directly on the question of whether Mrs. Thurston was covered by the policy, the heart of the controversy.

The evidence in the case was that the way the DRAC arrangement "worked" in practice was that Miller-Campbell "leases the car for a minimum of four months," at the end of which time "we usually just sell it" and "Chrysler gives an early retirement" and the dealer sends the money to pay for the car; that "we automatically sell these cars any time they're four months old and we have a buyer for them"; "if we find a buyer that's interested in that car, we just sell the car at the date that we have a buyer for the car . . . it's never been turned down. We've sold hundreds of them."

Under the above facts, Truck Insurance is not in a position to argue that Chrysler Leasing Corporation as the owner of the vehicle had not by implication and course of dealing given its consent, or at least acquiesced in the practice which had

been followed to where it could reasonably be believed that it had given its consent, to Miller-Campbell's placing of such vehicles in the possession and use of customers who believed they had purchased the vehicle, pending completion of the paper work. The cases on what constitutes permissive use of the insured automobile make clear that permission from the owner or the named insured can arise by implication or course of conduct, as well as by express permission. See *United States Fidelity & Guaranty Co. v. Safeco Ins. Co. of America*, 522 S.W.2d 809 (Mo.banc 1975). Mrs. Thurston, therefore, was using the car with the implied permission of Chrysler Leasing Corporation as well as with the direct permission of Miller-Campbell.

The Continental policy and the Truck Insurance policy differ as to coverage provided permissive users. The Continental policy, so far as third party users are concerned, as earlier stated, applies to rented automobiles. The Truck Insurance policy covers permissive users of hired automobiles (and under the definition of "hired automobile" found in the Truck Insurance policy, the station wagon was such a "hired automobile", even though it was not a rented automobile under the Continental policy) where the use is with the permission of the owner. Accordingly, the motion for rehearing is overruled.